[No. 2560]

KATE I. NIXON, BERTRAM E. NIXON, AND THE NIXON ESTATE COMPANY (A CORPORATION) AS TRUSTEE, RESPONDENTS, v. W. A. BROWN, FRANK GERMAIN, M. REINHART, GEORGE M. ROSE, ALBERT SEELINGER, J. SHEEHAN, M. D. STAUNTON, A. F. TROUSDALE, T. A. BRANDON, C. W. MULLER, AND H. C. OAST-LER, APPELLANTS.

[214 Pac. 524]

1. HUSBAND AND WIFE—HUSBAND MAY DISPOSE OF REASONABLE PORTION OF COMMUNITY PROPERTY WITHOUT WIFE'S CONSENT, IN ABSENCE OF FRAUDULENT INTENT TO DEFEAT HER CLAIMS.

Under Rev. Laws, 2160, practically adopting the Spanish-Mexican community property law, as it existed in California at the time of its cession by Mexico, the husband may voluntarily dispose of a reasonable portion of such property without his wife's consent, in the absence of a fraudulent intent to defeat her claims.

2. HUSBAND AND WIFE—WHETHER HUSBAND'S GIFT OF PART OF COMMUNITY PROPERTY IS REASONABLE, QUESTION FOR COURT IN EACH PARTICULAR INSTANCE.

Whether a husband's gift of community property is reasonable in proportion to the whole amount is a question for decision by the court in each particular instance.

3. HUSBAND AND WIFE—GIFT OF COMMUNITY PROPERTY WITHOUT WIFE'S WRITTEN CONSENT HELD NOT VOID AS UNREASONABLE IN PROPORTION TO WHOLE ESTATE.

A gift of community property, consisting of two town lots and a theater thereon, to trustees for the use of the people of a certain city by one rated as a millionaire at the time of his death *held* not so large, in proportion to the whole estate, as to be unreasonable or indicative of a fraudulent intent to defeat donor's wife's claims, and hence not void because she did not consent thereto in writing.

4. CONSTITUTIONAL LAW—WISDOM OF LAW PERMITTING HUSBAND TO CONVEY PART OF COMMUNITY WITHOUT WIFE'S CONSENT NOT FOR COURT.

Whether Rev. Laws, 2160, permitting the husband to convey part of the community property without his wife's consent, is wise is for the legislature, not the courts.

5. PERPETUITIES—CONSTITUTIONAL PROHIBITION EXCEPT FOR "ELEEMOSYNARY" PURPOSES NOT DIRECTED AT "CHARITABLE" TRUSTS.

Const. art. 15, sec. 4, prohibiting perpetuities except for eleemosynary purposes is directed at private and not public or charitable trusts, "eleemosynary" being synonymous with "charitable."

6. CHARITIES—CHARITABLE TRUST CONSTRUED AS VALID WHENEVER POSSIBLE.

Charitable trusts are favorites of equity, and are construed as valid whenever possible, by applying the most liberal rules permissible by the nature of the case.

7. CHARITIES—PURPOSE NEED NOT LESSEN BURDENS OF GOVERNMENT TO CONSTITUTE CHARITABLE TRUST.

The purpose for which a trust is created need not lessen the burdens of government in order to make it a charitable trust, within the statute of charitable uses, which was designed to be merely illustrative of the purposes for which such trusts could be created.

8. CHARITIES—GIFT OF THEATER IN TRUST FOR USE OF PEOPLE OF SMALL CITY HELD VALID AS PUBLIC OR CHARITABLE TRUST.

A gift of a theater in trust for the use of the people of a small city *held* a valid public or charitable trust, as enabling them to attend plays, concerts, and other functions which they otherwise could not, thereby increasing their happiness and social welfare.

9. CHARITIES—ESSENTIALS OF CHARITABLE USE STATED.

To constitute a charitable use, there must be a donor, a trustee competent to take, a use restricted to a charitable purpose, and a definite beneficiary.

10. CHARITIES—GIFT OF THEATER IN TRUST FOR USE OF PEOPLE OF CITY HELD SUFFICIENT TO CONSTITUTE CHARITABLE USE.

A gift of a theater in trust for the use of the people of a city *held* not insufficient to constitute a charitable use, there being a donor, trustees competent to take, a use restricted to a charitable purpose, and definite beneficiaries not restricted to a particular class.

11. CHARITIES—CONSTRUED AS CHARITABLE IF SUSCEPTIBLE OF EITHER
    THAT OR CONTRARY CONSTRUCTION.
       Where a trust is susceptible of construction as either a
    charitable trust or otherwise, the former conclusion should
    be accepted, in order to preserve the trust.

12. CHARITIES—DEED OF TRUST CONVEYING PROPERTY TO TRUSTEES
    FOR USE OF PEOPLE OF CERTAIN CITY HELD SUFFICIENT TO
    CREATE EXPRESS TRUST.
       A valid deed of trust, conveying to designated trustees and
    their successors in interest two town lots and a theater thereon
    for the use of the people of a certain city, held sufficient to
    create an express trust.

13. APPEAL AND ERROR—WHERE ONLY ERRORS ARE OF LAW, COURT
    ON REVERSAL WILL RENDER FINAL JUDGMENT OR REMAND WITH
    INSTRUCTIONS.
       Where the facts are undisputed, and the only errors are
    errors of law, the court, on reversal, will ordinarily render
    final judgment or remand the case, with instructions to enter
    judgment in accordance with its opinion or specific instruc-
    tions.

APPEAL from Sixth Judicial District Court, Humboldt
County; *C. J. McFadden, Judge.*

Action by Kate I. Nixon and others against W. A.
Brown and others. Judgment for plaintiffs and, defen-
dants appeal. **Reversed and remanded, with instruc-
tions. Petition for rehearing denied.**

*Thomas A. Brandon,* for Appellants:

"Charitable trusts are the favorites of equity; they
are construed as valid whenever possible by applying
the most liberal rules of which the nature of the case
admits, and are often upheld where private trusts would
fail. In consequence of such favor, gifts of this charac-
ter are sustained, although vaguely expressed." 2 C. J.
307; 5 R. C. L. 352.

A resulting trust is raised by implication or construc-
tion of law, and is presumed to exist from the supposed
intention of the parties and the nature of the transac-
tion. Constructive trusts arise purely by construction
of equity and are entirely independent of any actual or
presumed intention of the party. They are also known
as trusts ex maleficio or ex delecto. 39 Cyc. 26, 169,
171, 172.

The rule that the statute of limitations ordinarily does not run against express trusts is not applicable to trusts created by implication of operation of law. The holding of an implied or constructive trustee is for himself, and therefore at all times adverse. 17 R. C. L. 711, par. 66, and cases cited in notes.

The fundamental maxim of the common law that ignorance of the law excuses no one is only relaxed in equity where the mistake is mixed with misrepresentation or fraud, or where ignorance of the complainant has conferred upon the defendant a benefit which he cannot in good conscience retain. 20 Am. & Eng. Ency. Law, 2d ed. 816.

"Where a person with actual or constructive knowledge of the facts induces another by his words or conduct to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance upon such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice. This rule is of wide application." 16 Cyc. 791.

A gift for a public use is always charitable. Newcastle Common v. Megginson, 31 Am. & Eng. Ann. Cas. 1914A, 1907.

A gift for public entertainment and amusement is charitable. A donor has the right under the law so to provide. 5 R. C. L. 351.

A study of the cases cited in respondent's brief will show that not a single court has decided that the husband cannot make a gift of community property, though he cannot do so to gratify a caprice, thwart the law, beggar his family, or for his own personal aggrandizement. Stewart v. Endicott, 143 Pac. 458. Such gifts are sometimes sustained under the law of de minimus. Maston v. Rue, 92 Wash. 129, 159 Pac. 111.

*Warren & Hawkins* and *Warren & Dignan,* for Respondents:

The gift deprives the wife of her just share of the community property. In Re Williams Estate, 40 Nev. 241; Kohny v. Dunbar, 21 Idaho, 258; Beals v. Ares,

185 Pac. 793; Stewart v. Bank of Endicott, 143 Pac. 458; Maston v. Rue, 92 Wash. 129; 21 Cyc. 929; Schram v. Stearns, 166 Pac. 634; Garrozi v. Dastas, 204 U. S. 64; Davis v. Davis, 186 S. W. 775; Bister v. Menge, 21 La. Ann. 216.

Though benevolent, it was not "eleemosynary" or "charitable," and hence is not permitted. People v. Cogswell, 45 Pac. 271; Standard Dictionary; 3 Words and Phrases, 2343; In Re Gray's Estate, 71 Pac. 707; Perry on Trusts, 6th ed. 1142; Chamberlain v. Stearns, 111 Mass. 267; 6 Cyc. 907; Roth v. Emerson, 105 Mass. 431; Thompson v. Norris, 20 N. J. Eq. 489; Nash v. Morley, 5 Beav. 177; Johnson v. Johnson, 23 S. W. 114; Grimes v. Harmon, 35 Ind. 198, 9 Am. Rep. 690; Troutman v. De Boissiers Odd Fellows Orphans Home, 64 Pac. 34; Re Hartung's Estate, 39 Nev. 200; In Re Sutro's Estate, 102 Pac. 926.

The statute of limitations does not begin to run against an action by the cestui que trust until the time of the discovery by the latter of fraud or mistake on which it is based. Levy v. Ryland, 109 Pac. 905. An action for recovery of specific real property is not barred except by the five-year limitation. Murphy v. Crowley, 73 Cal. 820. Respondents' right to sue did not begin till after the death of the donor. Amy v. Dubuque, 98 U. S. 476, 25 L. Ed. 228; McGuigan v. Rolfe, 80 Ill. App. 256; Greiner v. Greiner, 58 Cal. 115; Culler v. Motzer, 15 Am. Dec. 804; McKay on Community Property, sec. 389; Wren v. Dixon, 161 Pac. 722; Nichols v. Caldwell, 114 N. E. 278; Dugan v. Gettings, 43 Am. Dec. 306; Dargie v. Patterson, 169 Pac. 360.

Laches does not, like limitations, grow out of the mere passage of time. Alsop v. Ricker, 155 U. S. 461, 39 L. Ed. 223; Hanchett v. Blair, 100 Fed. 827; Miller v. Walser, 42 Nev. 497.

By the Court, McNAMARA, District Judge:

Respondents commenced an action in equity in the Sixth Judicial District Court of the State of Nevada to set aside a certain instrument designated a "deed

of trust," executed on the 17th day of July, 1908, by the late George S. Nixon, then United States senator from Nevada, which position of honor and trust he held until his death, by which instrument certain premises situate in the town of Winnemucca, known as the "Nixon Opera House," were conveyed to certain residents of said town as trustees for the benefit of the people of Winnemucca, subject to certain conditions. The instrument was signed and acknowledged by the donor and delivered to the trustees on said date, who made written acceptance thereof on the instrument itself. The instrument is as follows:

"This deed of trust, made this 17th day of July, A. D. 1908, between George S. Nixon of the city of Reno, county of Washoe, State of. Nevada, the party of the first part, and M. S. Bonnifield, W. A. Brown, Frank Germain, M. Reinhart, George M. Rose, Albert Seeliger, J. Sheehan, M. D. Staunton, A. F. Trousdale, of the town of Winnemucca, county of Humboldt, State of Nevada, as trustees for carrying into effect the trust hereinafter provided, the parties of the second part, witnesseth:

"That whereas the party of the first part, George S. Nixon, in appreciation of the mutual esteem and kindly feelings now and heretofore existing between himself and the citizens of the town of Winnemucca, desires to manifest and perpetuate the same by deeding and conveying to the above-named parties, parties of the second part, and to their successors in interest, that certain piece, lot or parcel of land in the town of Winnemucca, Nevada, upon which is situated that certain building and appurtenances thereof, commonly known as and called the 'Nixon Opera House,' hereby deeds, conveys and forever quitclaims unto the said parties of the second part, and to their successors in interest, as hereinafter provided, subject to the conditions of trust in this deed hereinafter specified, the following real estate, to wit: Town lots number seven (7) and eight (8), on

the corner of Third and Melarkey streets in Block T
of the said town of Winnemucca, as surveyed and plat-
ted on the map of the town site of said town, together
with all and singular the building or buildings, and all
appurtenances thereof, and together with all furnish-
ings therein contained, to have and to hold forever,
subject to the following conditions, to wit:

"First: The said real estate, building or buildings
thereon situated, and furnishings thereof, shall be kept
free from debt as they now are.

"Second: Said premises and buildings shall be for
the use of the people of Winnemucca, Nevada, on all
public occasions, in a manner not deemed harmful,
inexpedient or unwise by the said parties of the second
part, or their successors in interest, and no discrimina-
tion in the use thereof on such public occasions by the
said public shall be made on account of political opin-
ions, religious beliefs, or any other considerations what-
soever not immoral or detrimental to good citizenship.

"Third: The said parties of the second part and
their successors in interest, as hereinafter provided for,
shall have the right to exact such compensation for the
use thereof, in cases of entertainment or amusement,
usually had or given for hire, but such compensation
shall be used only for the purpose of keeping said
premises in repair, suitable for the uses for which the
same has been constructed, and for meeting such ordi-
nary expenses as may be incurred or which may accrue
and be a charge against the same.

"Fourth: In the event of the death, removal from
the said Winnemucca, or the resignation of either of
the said parties of the second part, the remaining sur-
viving parties of the second part shall have the right,
and it shall be their duty, to select from among the
actual residents of the said town of Winnemucca, a suc-
cessor or successors to fill such vacancy or vacancies,
as the same may occur; and said successor or successors
shall be under the same obligations and have the same

right to fill any further vacancies which may occur, in the same manner as is herein conferred upon the said parties of the second part, herein named.

"George S. Nixon."

"We, the undersigned, parties of the second part, herewith by our signatures, receive as trust grantees the premises and properties in the foregoing deed mentioned, and agree to hold, manage and control the same, as honorary trustees, and without compensation, subject to the conditions and restrictions in the foregoing deed specified.

| M. S. Bonnifield. | W. A. Brown. |
|---|---|
| Frank Germain. | M. Reinhart. |
| George M. Rose. | A. Seeliger. · |
| J. Sheehan. | M. D. Staunton. |
| A. F. Trousdale. | |

"State of Nevada, County of Humboldt—ss.:

"On this 17th day of July, A. D. 1908, before me, W. S. Bonnifield, Jr., a notary public in and for the county of Humboldt, State of Nevada, personally appeared Geo. S. Nixon, known to me to be the person described in and who executed the annexed instrument and who personally acknowledged to me that he, said Geo. S. Nixon, executed the same freely and voluntarily, and for the uses and purposes therein mentioned.

"In witness whereof I have hereunto set my hand and official seal the day and year in this certificate first above written.

"[Notarial Seal.]          W. S. Bonnifield, Jr.

"Notary Public."

George S. Nixon, at the time of the execution and delivery of the instrument, was married to Kate I. Nixon, one of the respondents, the marriage having been solemnized January 30, 1887, at Humboldt, Nevada. As the result of this union a son was born, as near as can be ascertained from the record, during the year 1888, to wit, Bertram E. Nixon, also a respondent in the action. George S. Nixon and Kate I. Nixon were living together as husband and wife at the time the

instrument in question was executed, and it appears
from the record that there never had been any agree-
ment or settlement concerning property rights between
them during the life of the former, and that the union
in all respects was a happy one. It is admitted that the
property conveyed by the deed of trust was community
property, not a portion of a homestead; and that the
wife never signed or otherwise consented in writing to
the conveyance. Senator Nixon and his family resided
for many years in Winnemucca, and were widely known
and acquainted in that community. On the evening of
April 20, 1907, at a farewell reception in the town of
Winnemucca, given by the senator and his wife, the
senator announced his intention to build and present
to the town of Winnemucca an opera house. The
corner-stone of the structure was laid September 14,
1907, and was made the occasion of public exercises, at
which Mrs. Nixon was present, Senator Nixon being
absent. The structure was formerly presented to the
town July 17, 1908, the presentation having been made
in the building itself. Senator Nixon made the presen-
tation speech, and his wife was present and among those
seated on the stage during the ceremonies. The con-
veyance above set forth was delivered to and accepted
by the trustees at the time, and shortly thereafter was
recorded in the office of the county recorder. Mrs.
Nixon and Bertram Nixon during the early part of the
evening assisted in receiving and welcoming the guests
upon their arrival. The occasion was a public one. The
cost of erecting and equipping the building and the
premises upon which it is situate was about $50,000.
Senator Nixon's wealth at the time of making the gift
was estimated at between three and five million dollars,
and at the time of his death he was admitted to be a
millionaire. His death occurred June 5, 1912, and this
action was commenced in the court below May 31, 1917.

Senator Nixon died testate, leaving surviving him
the said Kate I. Nixon, his wife, and Bertram Nixon,
his son. He disposed of his interest in the community

property and all other property in trust, naming the Bank of Nevada Savings and Trust Company trustee, by the terms of which certain annuities were to be paid, the said Bertram Nixon to receive all the rest, residue, and remainder of the property of the estate upon his attaining the age of 35 years, subject to the further provision that, if said Bertram Nixon should die before he arrived at the age of 35 years, the rest and residue and remainder of the said estate should go to Kate I. Nixon, to be added to her interest in the community property. Prior to the commencement of this action the property was distributed to the Nixon Estate Company (substituted for the Bank of Nevada Savings and Trust Company), subject to the terms, conditions, and provisions of the trust created by the will.

Respondents by their petition below sought to have the instrument in question set aside: First, upon the theory that in this state a husband cannot make a gift from the community property unless the wife joins in the conveyance, so as to preclude her from thereafter attacking the validity of the instrument; second, that, by the terms of said instrument, the trust created, if otherwise valid, was in law a private trust in perpetuity, prohibited by article 15, section 4, of the constitution of the State of Nevada, and therefore void. Appellants by their answer denied the contention of plaintiff, invoked the statutes of limitation, and set up as affirmative defenses laches and equitable estoppel.

Judgment was entered for respondents in the court below, the instrument being held invalid for the reason that it was not signed by Kate I. Nixon, and because it did not create a public charity within the meaning of article 15, section 4, of the constitution of Nevada.

From this judgment and from an order denying and overruling a motion for a new trial this appeal is prosecuted. The reporter's original notes were destroyed by fire before the transcript was prepared, and this portion of the record is now before us in narrative form, under a stipulation between the parties as to the substance

of its contents. The appeal presents several questions, the two most important being: (1) Is the instrument designated as a "deed of trust" void or voidable, upon the suit of respondent Kate I. Nixon, because not consented to in writing by her? (2) Is the instrument in question contrary to or in violation of art. 15, sec. 4, of the constitution of Nevada, and for this reason void? We will discuss and dispose of the above questions in the order of their enumeration.

The first question squarely presents the proposition: Can the husband in Nevada, during coverture, make a gift of a portion of the community property without obtaining the written consent of the wife? A gift negatives any idea of a consideration, either nominal or substantial, to the community interest.

The law of community property seems to have originated among the early German tribes (being known as the law of Gananciales), being unwritten and brought into Spain by the Visigoths, and first reduced to writing in the Code of Euric or Tolosa (466–484 A. D.). It became the law of Mexico with the coming of the Spaniards in 1521, and the following years, and after the treaty of Guadalupe Hidalgo, inherited as the law of California, with such changes as were deemed advisable. It was adopted in Washington, Nevada, Idaho, and Arizona by constitutional and statutory enactment. Spreckels v. Spreckels, 116 Cal. 347, 48 Pac. 228, 36 L. R. A. 497, 58 Am. St. Rep. 170.

The systems are not exactly alike, as the statutes differ in several respects in the various states, the State of Nevada adopting the law almost as it was administered in Mexico, known as the Spanish-Mexican civil law, and as it was administered in California under the early statutes. These statutes have been judicially construed in California with reference to the question under consideration, and it is therefore to those early California cases and the original law we must look for a solution, rather than to those of Washington, Arizona, Idaho, and Texas, because the statutes are in many

respects different, and because the question has never been directly passed upon by the supreme court of this state. It is stated in the Estate of Moffitt, 153 Cal. 363, 95 Pac. 1026, 20 L. R. A. (N.S.) 207:

"The Spanish-Mexican civil law was, of course, the law in force in California at the time of its cession by Mexico to the United States, and it was the design of the constitution of 1849 to preserve, so far as might be, to the wives of the inhabitants of the new state (most of whom were at that time former citizens of Spain or Mexico) the rights to the community property which they had enjoyed under the Mexican rule."

It is further stated, in Meyer v. Kinzer, 12 Cal. 251, 73 Am. Dec. 538:

"The statute defining the rights of husband and wife provides in its first section that 'all property, both real and personal, of the wife, owned by her before marriage, and that acquired afterwards by gift, bequest, devise or descent, shall be her separate property; and all property, both real and personal, owned by the husband before marriage, and that acquired by him afterwards, by gift, bequest, devise or descent, shall be his separate property'; and, in the second section, that 'all property acquired after marriage, by either husband or wife, except such as may be acquired by gift, bequest, devise or descent, shall be common property'; and, by the ninth section, the husband is invested with the entire management and control of the common property, with the like absolute power of disposition as of his own separate estate."

It is to be noted that the California statute quoted is identical with the statute of Nevada dealing with the husband's right to dispose of community property. Section 2160 of the Revised Laws of Nevada reads as follows:

"The husband has the entire management and control of the community property, with the like absolute power of disposition thereof, except as hereinafter provided, as of his own separate estate.   *   *   *"

This language is practically an adoption of the Spanish-Mexican civil law, as we will see from the following quotation taken from "Escriche's Diccionario Rozonado de Legislacion y Jurisprudencia," Lomo 2, p. 86, et seq.:

"The husband and the wife have the dominion of the Ganancial properties, laws 1 and 4, tit. 4, lib. 10, Nov. Rec., with the difference that the husband has it in custom (habito) and in act (acto), as the authorities explain, and the wife only in custom (habita) the act (acto) passing to her when the marriage is dissolved. For that reason the wife cannot give nor convey said properties during the marriage, but the husband can without the consent of the wife make their inter vivos conveyances moderately for just causes; but the excessive or capricious gifts will be null, and the conveyances made with intent to defraud the wife, who will have action in all these cases against the properties of the husband and against the possessor of the things conveyed."

We quote again from Febrero's Liberia de Escribanos, Cinco Juicios 7, lib. 1, cap. IV, sec. 7:

"And further, that the properties which were gained, and improved, and multiplied during the marriage between the husband and wife, which were not 'castrenses nor quasi castrenses,' that the husband may alienate the same, during the marriage, should he desire, without the license or authorization of his wife; and that the contract of alienation shall be valid, unless it be proved that it was made craftily to defraud or injure the wife."

We quote again from the early community property law as promulgated by Novisima Recopilacion, vol. 5, book 10, title 4 (of the Ganancial Properties, or acquired in the marriage):

"That the properties which were gained, improved and multiplied during the marriage between the husband and the wife, which were not 'castrenses,' that the husband may convey the same during the marriage,

if he wishes, without license nor authorization of his wife, and that the contract of conveyance shall be valid, unless it be proved that it was made deceitfully to defraud or injure the wife."

In the case of Lord v. Hough, 43 Cal. 581, decided in April, 1872, at a time when the California statute was identical with ours, it is stated:

"A deed of gift of a portion of the common property by the husband is not void per se. If the gift be made with the intent of defeating the claims of the wife in the common property, the transaction would be tainted with fraud. In the absence of such fraudulent intent, a voluntary disposition of a portion of the property, reasonable in reference to the whole amount, is authorized by the statute which gives to the husband the absolute power of disposition of the common property as of his own separate estate."

It is again stated in Smith v. Smith, 12 Cal. 216, at pages 224, 225, 73 Am. Dec. 533:

"The law, in vesting in the husband the absolute power of disposition of the common property as of his separate estate, designed to facilitate its bona fide alienation, and to prevent clogs upon its transfer by claims of the wife; and we are not prepared to say that, under the comprehensive language of the statute, a voluntary settlement, or a gift of a portion of the common property, not being unreasonable with reference to the entire amount, the claims against it and the situation of the parties, would be invalid. But we think it clear that the law, notwithstanding its broad terms, will not support a voluntary disposition of the common property, or any portion of it, with the view of defeating any claim of the wife."

This principle was affirmed in Peck v. Brummagim, 31 Cal. 440, at page 446, 89 Am. Dec. 195, where it is stated:

"No good reason is perceived why the husband, while free from debts and liabilities, may not make a gift to his wife of either real or personal property which at

the time was the common property of the husband and wife. The statute confers upon him the like absolute power of disposition of the common property, as of his own separate estate; but there is this necessary restriction upon his power, that he cannot make a voluntary disposition with the view of defrauding or defeating the claims of the wife."

See, also, Greiner v. Greiner, 58 Cal. 116.

Ruling Case Law also adopts the view expressed in these decisions, in volume 5, at page 854, where it is stated:

"As a general rule, in the absence of a fraudulent intent to defeat the wife's claims, the husband may make a voluntary disposition of a portion of the property reasonable in reference to the whole amount."

It is also stated by Pomeroy in his work on Equity Jurisprudence, vol. 1, p. 959, art. 503 (4th ed.):

"During the marriage the husband alone has the custody, control, management, and power of disposition of the community property, and it is liable for his debts; but still in theory the wife has an inchoate, undivided interest in it during the entire coverture, so that the husband cannot transfer it by mere gift or otherwise with the intent and purpose of defrauding her of her share, or of defeating her exclusive interest expectant upon his death."

It is also held in the later California case of Spreckels v. Spreckels, 116 Cal. 339, 48 Pac. 228, 36 L. R. A. 497, 58 Am. St. Rep. 170, that the husband, in the absence of fraud or the intent to deprive the wife of her interest in the community property, might dispose of a portion thereof by gift.

It is true the supreme court of this state in the case of In Re Williams's Estate, 40 Nev. 241, 161 Pac. 741, L. R. A. 1917c, 602, refused to follow the holding in the Spreckels case to the effect that the wife's interest in the community property was a mere expectancy, but we do not think, in view of the cases cited, and the provisions of the early texts on the law of community

property, that it makes any difference, so far as the husband's right of control and the disposition is concerned, whether or not the wife's interest during coverture is vested or is a mere expectancy. We think Chief Justice Beatty, in his concurring opinion in the Spreckels case, supra, announces the true rule when he stated:

"If the husband makes a gift or voluntary transfer of community property, the transfer is good against him. He has no right of action to recover it back. The only person who, in any case, has a right to complain is the wife, and she cannot maintain an action to revoke the gift until she has been injured by it."

Respondents laid much stress on the Williams Estate case above mentioned, contending that, if the learned chief justice who wrote the opinion followed his treatise on the law of community property to a logical conclusion, he would have deprived the husband during coverture of the right or power to make a gift of the community interest without the consent of the wife. We have examined the case with a great deal of care and caution, and do not believe there is anything contained therein to warrant such an inference. This case holds that the interest of the wife in the community property and her title thereto is no less than that held by the husband, and this interest and title in the wife is not to be regarded as a mere expectancy, but that the wife's interest in the community property goes to her, not by succession or inheritance, but rather by right vested in her at all times during marriage.

This statement of the law as to the nature of the wife's interest in the community property during marriage we think sound in law, and unquestionably corrects an erroneous view which some of the California jurists entertained with reference to the wife's interest, but it does not attempt in any way to lessen the husband's control over the community property, or his right to dispose of the same as given to him by the early Spanish or Mexican law, and as decided in the cases mentioned above.

Much stress is laid on the case of Marston v. Rue, 92 Wash. 129, 159 Pac. 111, and it was on the holding

in this case that the court below held the instrument in question to be void for failure on the part of the donor to obtain the written consent of his wife. We are loath to follow the holding of the Washington cases, for the reason that their statute is entirely different from ours, in that the husband cannot convey any portion of the community interest in the real property without the consent of the wife. In the Marston case it further appears that the gift in question was a whimsical one, made to the paramour of Marston, and the court practically finds that the gift in that case was a wilful, premeditated waste of family personal property. There is no mention made in this case as to what the entire value of the community interest was or would be, and it may be, so far as the facts in this case disclose, a gift so great in magnitude as to reduce the community interest to practically nothing. If such is the case, undoubtedly the husband had no such authority under any of the states' statutes, as far as we have been able to ascertain, which adopted the community-property law.

We have also examined the cases decided by the United States Supreme Court, referred to by respondents; that is, Warburton v. White, 176 U. S. 484, 20 Sup. Ct. 404, 44 L. Ed. 555, and Arnett v. Read, 220 U. S. 311, 31 Sup. Ct. 425, 55 L. Ed. 477, 36 L. R. A. (N.S.) 1040. We do not believe there is anything in these cases in conflict with the views expressed by the California courts in the cases above cited.

1. From a review of the entire subject, we are of the opinion that the State of Nevada, by constitutional and statutory enactment, adopted the community - property law as it existed in Spain and in Mexico, and as it existed in California at the time of its cession from Mexico. This law, as above stated, has been construed by the California courts at a time when their statutes were identical with ours upon the subject under consideration, and they have laid down what we believe to be the. true rule with respect to the limitations imposed upon the husband during coverture on his right to dispose of community property, and that is that

he may make a voluntary disposition of a portion of the community property, reasonable in reference to the whole amount, in the absence of a fraudulent intent to defeat the wife's claims.

2. Whether or not the gift is reasonable or unreasonable, is a question to be decided by the courts in each particular instance, and no hard-and-fixed rule can be laid down as to just what proportion of the community interest can be so disposed of by the husband.

3. This leads us in the instant case to a consideration of whether or not the gift in question was a reasonable or an unreasonable one. It is admitted that Senator Nixon, at the time of making the gift, was wealthy; that his wealth was estimated as between three and five million dollars; that at the time of his death he was rated as a millionaire. And we have searched the petition in vain to find an allegation on the part of the respondents that the gift was made with the intention of depriving the wife of her just interest in the community property. We do not believe it is so large in proportion to the whole estate that a fraudulent intent can be inferred, or that it was unreasonable with reference to the value of the entire estate. And the acts and conduct of respondent Kate I. Nixon negative any thought that she possessed the idea for a minute that Senator Nixon was in any way attempting to deprive her of any portion of her rightful interest in and to the community property; but on the contrary leads us to the conclusion that she was in full accord with the senator's plans, and that she did not for a moment think the gift was unreasonable, considering their financial circumstances, either at the time it was made or at the time of the senator's death. We therefore must conclude that the instrument in question was not and is not void for the reason that Senator Nixon did not procure his wife's consent thereto in writing.

4. Whether it is a wise provision of the law that the husband can make a voluntary conveyance of a portion

of the community property we are not at liberty to decide. That is a question for the legislature. The husband possessed such right, subject to the limitations above mentioned, under the community-property law as administered in Spain and Mexico, and later as administered in California, affirmed by judicial precedent, and in that state until the legislature decreed otherwise. If it was the law then in those countries and in that state, it must follow that it is the law here in this state under identical statutes until the legislature shall decree otherwise, as has been done in some of the states which have adopted the community-property law.

5. We will now pass on to the next question enumerated above, and that is: "Was the trust created by the instrument in question a private trust or a charitable public trust?" In other words, Was it for an eleemosynary purpose? Article 15, section 4, of the constitution of the State of Nevada provides: "No perpetuities shall be allowed except for eleemosynary purposes."

It may be admitted at the outset that the estate created was and is an estate in perpetuity for the benefit of the people of Winnemucca. By the provisions of the constitution above set forth, perpetuities are prohibited except for eleemosynary purposes. "Eleemosynary" has been the subject of much judicial discussion and interpretation, and it is generally conceded that "eleemosynary" is synonymous with "charitable," as the latter term is used in its technical sense in law. 15 Cyc. 482; 20 Corpus Juris, 399; Hamburgher v. Cornell University, 99 Misc. Rep. 564, 166 N. Y. Supp. 46–48; People v. Cogswell, 113 Cal. 129, 45 Pac. 270, 35 L. R. A. 269. The constitutional provision against perpetuities is directed at private trusts and not at public or charitable trusts. Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401; 21 R. C. L. 306, sec. 33; White v. Keller, 68 Fed. 796, 15 C. C. A. 683.

6. This leads us to the inquiry as to whether or not the trust created was a private trust or whether it was a public charitable trust. In dealing with this question, at the outset the principle is very clearly laid down as to how a court of equity shall look upon the question. In Corpus Juris, vol. 11, p. 307, it is stated:

"Charitable trusts are the favorites of equity; they are construed as valid whenever possible by applying the most liberal rules of which the nature of the case permits, and are often upheld where private trusts would fail. In consequence of such favor, gifts of this character are sustained, although vaguely expressed."

It is further stated, in Ruling Case Law, vol. 5, p. 352:

"Legacies or devises to the uses of charity are entitled to peculiar favor and are regarded as privileged testaments, and will not be declared void if they can by any possibility consistent with law be considered as good. So courts of equity go to the length of their judicial power, rather than that such a trust should fail. * * * They are construed so as to give them effect if possible, and to carry out the general intention of the donor when clearly manifested, even if the particular form and manner pointed out by him cannot be followed. If two modes of construction are fairly open, one of which would turn a gift into an illegal trust, while by following the other it would be valid and operative, the latter mode must be preferred."

See, also, In Re Coleman, 167 Cal. 212, 138 Pac. 992, Ann. Cas. 1915c, 682.

7. What are and what are not charitable trusts has been the subject of much judicial discussion. The general objects which come within the description of "charitable uses," and which may therefore constitute a valid charitable trust, were enumerated within the statute of charitable uses passed in the reign of Queen Elizabeth, which statute is generally known as the statute of Elizabeth. The English and American courts have never regarded the enumeration of the purposes

for which said trusts could be created mentioned in the statute as exhaustive, but that the statute was designed to be merely illustrative. Pomeroy's Equity Jurisprudence, vol. 3, p. 2269, sec. 1020 (4th ed.).

Respondents contend that, unless the purpose for which the trust is created will lessen the burdens of government, the trust is not a charitable one, and is therefore void as being within the statute. We cannot adhere to this rule, as we believe the modern authorities are not at all in accord with this view.

It is stated in Pomeroy's Equity Jurisprudence, vol. 3, at page 2276, that:

"Numerous trusts for purposes of benevolence are upheld as charitable, although not mentioned in the statute, since they are within its spirit and intent."

The text cites a number of cases to support this conclusion. It has also been held in the case of Trustees of New Castle Common v. Megginson, 1 Boyce (Del.) 361, 77 Atl. 565, Ann. Cas. 1914A, 1207, that:

"The words 'charitable uses' include all gifts for a general public use, independent of benevolent, educational, or religious purposes."

And the case further holds:

"A gift of land to trustees 'for the use of the inhabitants of the town of New Castle' is a charitable trust or use."

It is further stated in this case:

That "gifts to and for a general public use or for lessening the burdens of government are charitable trusts, and are not within the prohibition of the rule against perpetuities, and are valid and will be enforced and administered by the court in chancery."

A long list of decisions is collected in this case, determining what may be the subject of a charitable trust, among them being: "A gift 'for the benefit and ornament' of a town"; "for erecting a town-house." Coggeshall v. Pelton, 7 Johns. Ch. (N. Y.) 292, 11 Am. Dec. 471.

A definition of a charity set out in that case seems to be the one most generally adopted by courts in dealing with these subjects. It is as follows:

"Charitable trusts include all gifts in trust for religious and educational purposes in their evervarying diversity; all gifts for the relief and comfort of the poor, the sick and the afflicted; and all gifts for the public convenience, benefit, utility or ornament, in whatever manner the donor desires to have them applied."

See, also, Ruling Case Law, vol. 5, p. 298, and same volume of this work at page 210.

The Supreme Court of the United States defines the scope of a charitable use in Ould v. Washington Hospital, 95 U. S. 303, 24 L. Ed. 450:

"A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man."

It is further said, in Episcopal Academy v. Taylor, 25 Atl. 55:

"Whatever is gratuitously done or given in relief of the public burdens, or for the advancement of the public good, is a public charity. In every such case, as the public is the beneficiary, the charity is a public charity."

It is further stated, in Pomeroy's Equity Jurisprudence, vol. 3, at page 2285, that:

"Other public purposes, not in the ordinary sense benevolent, may be valid charities, since they are either expressly mentioned by the statute, or are within its plain intent. All of these purposes tend to benefit the public, either of the entire country or of some particular district, or to lighten the public burdens for defraying the necessary expenses of local administration which rests upon the inhabitants of a designated region."

8. Viewed in the light of these decisions, and of many others, the purposes for which the trust was created must be held to be a public or charitable one. The theater, which was the subject of the gift, as appears from the record, was rather an elaborate one for a city whose population is small. It undoubtedly

enabled the people of Winnemucca to attend many public occasions and functions that they otherwise could not. Again, it furnishes a means which the people of Winnemucca otherwise would not have had for attending plays, concerts, and other functions, thereby increasing to some extent their happiness and social welfare. If the trust is in other respects valid, as required by law, we think the purpose for which it was created is and must be considered a public or charitable one.

9. Respondents quoted at length from the case of Grimes's Exr. v. Harmon, 35 Ind. 198, 9 Am. Rep. 690, in support of their contention that the trust under consideration is not one for a public charitable purpose. In that case the trust failed for the reason that the beneficiaries were not sufficiently designated. Such, we think, is not the case here. Adopting the definition of a charitable use as contained in that case, we have the following: (1) "To constitute a charitable use there must be a donor." (2) "A trustee competent to take." (3) "A use restricted to a charitable purpose." (4) "A definite beneficiary."

10. In measuring the trust under consideration according to the standard set forth above, it must be admitted: (1) There was a donor, George S. Nixon. (2) That the trustees were competent to take. (3) That the use was restricted to a charitable purpose, as decided above upon very respectable authority. (4) A definite beneficiary, the people of Winnemucca.

Further, it must be conceded that the beneficiaries are an indefinite number of people, in that the population is continually changing, and any one may enjoy the benefits of the charity by becoming one of the people of Winnemucca. The beneficiaries are not a restricted class.

11. It is true that the question involved as to whether or not the gift was a charitable one is a question upon which many able and learned jurists have differed, but, viewing this question in the light of the rule laid down for courts of equity in such cases—that is, where the trust is susceptible of two conclusions, one that the gift

was charitable and the other that it was not, that courts should adopt a conclusion accepting the former in order to preserve the trust—we believe such must be the conclusion in this case.

12. The instrument, having been heretofore held to be valid, was sufficient to create an express trust. Pomeroy's Equity Jurisprudence, vol. 3, p. 2235, art. 1009 (4th ed.). There is nothing contained here in the view expressed in conflict with the holdings in the case of In Re Hartung's Estate, 39 Nev. 200, 155 Pac. 353, 159 Pac. 864; Idem, 40 Nev. 262, 160 Pac. 782, 161 Pac. 715.

For the reasons stated above, and, in view of the order to be made in this case, we deem it unnecessary to pass upon the question of laches, equitable estoppel and the statute of limitations urged by appellants, as being a bar to the action.

13. Adopting the rule laid down in the very recent case of Warren v. Wilson, 46 Nev. 272:

"Where the facts of the case are undisputed and the only errors therein are errors of law, the court on reversal ordinarily will render final judgment or will remand the case to the lower court, with directions to enter judgment in accordance with the opinion or with specific directions."

It is hereby ordered that the judgment and order appealed from be and the same hereby are reversed, and that the case be remanded with instructions to enter judgment for appellants in accordance with the views expressed herein.

COLEMAN, J.: I concur.

SANDERS, J.: I concur.

DUCKER, C, J., being disqualified, Hon. J. M. McNAMARA, District Judge, was designated by the Governor to sit in his stead.

ON PETITION FOR REHEARING

*Per Curiam:*

Rehearing denied.