GENE C. RANDONO, Individually, and dba LAS VEGAS
COLLECTION & ADJUSTMENT BUREAU, INC.;
LAS VEGAS COLLECTION & ADJUSTMENT
BUREAU, INC., a Partnership, and LAS VEGAS
COLLECTION & ADJUSTMENT BUREAU, INC., a
Corporation, Appellants, v. ARTHUR E. TURK,
Also Known as ARTHUR JOHNSON, or ART
JOHNSON, and FLORENCE M. TURK, Also Known
as FLO WALTERS, Respondents.

No. 5672

February 24, 1970 466 P.2d 218

[Rehearing denied March 25, 1970]

*Edwin S. Pomeranz* and *Daryl Engebregson,* of Las Vegas,
for Appellants.

*Rudiak & Publow,* of Las Vegas, for Respondents.

## OPINION

By the Court, COLLINS, C. J.:

This is an appeal from a judgment in favor of respondents (plaintiffs below) against appellants (defendants below). Appeal is also taken from an order amending the findings, conclusions and judgment and from an order refusing to retax costs. Respondents cross appeal from a judgment in favor of appellants on a promissory note.

We affirm in all respects.

The suit commenced by respondents, hereinafter referred to as "Turks," concerns a series of dealings with appellants, hereinafter referred to as "Randono," commencing in 1959 and continuing for two or three years thereafter.

Turks are entertainers. Randono is a promoter of business deals and a real estate salesman. Turks and Randono became acquainted in the summer of 1959 when he handled the sale of Turks' residence and purchase of a new one. Turks gave him a

promissory note for his commission, which is the subject of their cross appeal.

The parties became good friends socially and developed a close relationship. Several business transactions resulted in which Randono undertook to aid, counsel and advise Turks in investment of their earnings and savings.

The three transactions between the parties which are the subject of this appeal will be stated separately.

## ARIZONA LANDS

In the latter part of 1959, or early January, 1960, Randono informed the Turks of an opportunity for them to acquire a half interest in 320 acres of Arizona land which could later be subdivided and resold for a profit. The Turks claim Randono told them they would go together and buy the 320 acres at $21 an acre. Randono claims he told them he had purchased the land and would sell them a half interest for $3,400.

Randono had entered an escrow agreement with another person in December, 1959, to buy a 320-acre plot, a 160-acre plot and a 40-acre plot from parties in Arizona for $11 an acre. This escrow was cancelled, and one with Randono only, as buyer, was opened in January, 1960. Another escrow was opened in January, 1960, with Randono as seller and the Turks as buyers of a 50 percent undivided interest in the 320-acre plot. The Turks gave Randono a $3,360 check to be placed in their escrow account. No money was ever placed in this account, but one check in the same amount was deposited in the escrow account of Randono's for purchase of the full 520 acres. Title to the entire 520 acres was taken in Randono's name and never changed.

## COLLECTION AGENCY

In November, 1960, Randono purchased Las Vegas Collection & Adjustment Bureau, Inc., for $4,000. He paid $100 down and gave the sellers a note for the balance payable at $60 per month.

In early 1961, Randono suggested to the Turks that this would be a good investment. Here again, the testimony differs. Randono claims he offered them half of the stock in the agency, for which the Turks gave him $12,435, and 1,315 shares of "Steam Wells, Inc." stock. This stock had been sold to the Turks earlier by Randono, who was then an officer of the company offering the stock and president of Steam Wells, Inc. The Turks had paid $1 per share for 1,000 shares and received 315 more for getting friends to buy the stock. Randono told the

Turks the agency was for sale for $25,000 and they would go partners, putting up $12,500 each plus $1,250 for operating expenses. The Turks stated that throughout the "negotiations" Randono treated it as though they were negotiating with someone else; he never admitted he was already the owner. Two stock certificates were issued to the Turks, but they thought they were in a partnership with Randono until their tax accountant informed them differently.

For several months the Turks received $84 per month for what they testified was an agreed upon return on investment. Randono suggested that this money was for services rendered, but the Turks rendered none. When asked how the $84 figure was arrived at, Randono stated it was based upon 6 percent of the price of the stock.

Within eight months of the sale to the Turks, the collection agency, having made no money at all, was defunct. The assets were transferred for no consideration to a credit bureau owned by Randono. The same people who ran the collection agency also ran Randono's credit bureau.

After the Turks complained to Randono about not receiving their $84 per month, and after he had stalled them for several months with various excuses, he orally agreed to buy back their share of the business for the price they paid. This promise was never kept.

## PROMISSORY NOTES

In 1960, Randono obtained two notes secured by second deeds of trust on apartment houses. Around the first of March, 1961, the Turks acquired the notes from Randono by assignment. The notes were not endorsed over to them. Randono claimed the notes were sold to the Turks for their face value. The Turks contended they loaned Randono $8,816.98. At the time of the transaction, the notes had a balance due of $8,785.70. The Turks said the reason the notes were assigned was so that they could receive the interest, which was higher than they had been getting on their money at the bank, and thus they would not lose money while their "friend" was using theirs.

In November, 1961, the apartment houses were sold to Prudential Diversified Investors. Randono was the broker and received a $40,000 note for his commission from the buyer. Prudential later sold the apartments to one of its officers, and in 1963 he defaulted on the notes secured by the apartments.

Randono told the Turks the notes "were as good as gold" and he would buy them back if they went bad. The Turks claimed they tried unsuccessfully to get Randono to buy the notes back when they were in default. Finally, the Turks bid $1

on each note at a trustee's sale, but realized nothing on the security because the first deeds of trust were also in default and were shortly thereafter sold, wiping out the security for the notes held by the Turks.

## ISSUES

I. Did the trial court err in applying a constructive trust on the entire 520 acres in Arizona?

II. Did the trial court err with respect to the collection agency transaction by awarding money damages instead of restitution of money and stock and by awarding exemplary damages?

III. Did the trial court err in finding Randono liable on an oral promise to repurchase the promissory notes and was this liability discharged by the trustee's sale?

IV. Did the trial court err in amending its judgment to make community property of appellant and his wife liable for the judgments even though she was not a party to the suit?

V. Did the trial court err in denying appellant's motion to retax costs on the grounds it was not timely filed?

VI. Did the trial court err in awarding judgment to Randono on his counterclaim for the amount payable to him under the Turks' promissory note?

1. The trial court imposed a constructive trust upon the entire 520 acres of the Arizona property and adjudged Turks to be a 50 percent owner therein. This conclusion was predicated upon a finding that Randono had fraudulently induced Turks to give him $3,364.14 toward purchase of 320 acres of land at $20 per acre, which in fact was purchased for $11 per acre, and that Randono failed to disclose purchase of the additional 200 acres with the Turks' money.

A constructive trust arises when (1) "the circumstances under which property was acquired makes it inequitable that it should be retained by him who holds the legal title. . ."; (2) "some confidential relationship exists between the two. . ."; (3) "the raising of the trust is necessary to prevent a failure of justice." Schmidt v. Merriweather, 82 Nev. 372, 375, 418 P.2d 991 (1966). Proof of those circumstances must be by clear and convincing evidence. Garteiz v. Garteiz, 70 Nev. 77, 82, 254 P.2d 804 (1953). Parole evidence is admissible to prove the facts and circumstances constituting fraud from which the trust arises. Moore v. De Bernardi, 47 Nev. 33, 50, 213 P. 1041 (1923).

Appellants contend, however, there was no specific finding of

a confidential relationship between Randono and the Turks, nor as a matter of law could such relationship exist.

" 'A confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, *whenever one trusts in and relies on the other*. The question in such case is always whether or not trust is reposed' . . . . In order for such relation to exist 'there must be evidence of a special trust with respect to the property or business.' " (Emphasis added.) Wilhoit v. Fite, 341 S.W.2d 806, 813 (Mo. 1960) (quoting Hedrick v. Hedrick, 168 S.W.2d 69 (Mo. 1943)).

Additionally, in G. Bogert, The Law of Trusts and Trustees § 482 (2d ed. 1960), it is written, "Investment advisors have been held to occupy a confidential relation toward those advised." In that same work, at § 483, it is provided, "Where a trustee or other fiduciary holds property to be used for the benefit of his cestui, it is, of course, a breach of his trust to employ the property for his own private advantage, *as where he spends or consumes it for his own benefit, or uses it directly to acquire other property in his own name*. This civil wrong, the breach of trust, is as reprehensible as the criminal act of embezzlement, from the point of view of equity. It is readily admitted to be a sufficient basis for charging the fiduciary with a constructive trust as to any avails of the breach of his express trust." (Emphasis added.)

There was, in our opinion, sufficient evidence to support a finding of the trial court of a confidential relationship. See Kinert v. Wright, 185 P.2d 364 (Cal.Dist.Ct.App. 1947). In the absence of an express finding, the law implies a finding in favor of the judgment. Richfield Oil Corp. v. Harbor Ins. Co., 85 Nev. 185, 452 P.2d 462 (1969).

Alternatively, the lower court's findings that the land was jointly purchased to be held for six months and then resold in small parcels established a joint adventure. Joint adventurers owe each other a fiduciary duty. Botsford v. Van Riper, 33 Nev. 156, 192 (1910).

We will not disturb the trial court's judgment awarding each of the parties a 50 percent interest in the Arizona lands instead of giving respondents a 53.76 percent interest because of their monetary contribution as urged in their cross assignment of error. There was substantial evidence to support the trial court's ruling.

2. On the collection agency transaction, the lower court
██

found that Randono falsely represented the value of the interest sold to the Turks, fraudulently failed to disclose he was the owner at the time of the sale, transferred the assets without notice to the Turks to a corporation owned by him and subsequently agreed to repurchase their interest, which he failed to do. That court determined the Turks suffered actual damages of $13,750, less three payments of $84, as a result of that fraud. Punitive damages of $10,000 were assessed against Randono.

Appellants contend the lower court erred in awarding the Turks $1,315 in money rather than ordering a return of the stock certificates given him by the Turks. The lower court obviously awarded damages in tort for fraudulent deprivation of property and not upon the contract theories of rescission or novation. Substantial evidence supports that holding.

The measure of damages for fraudulent misrepresentation can be determined in one of two ways. The first allows the defrauded party to recover the "benefit-of-his-bargain," that is, the value of what he would have if the representations were true, less what he had received. The second allows the defrauded party to recover only what he has lost "out-of-pocket," that is, the difference between what he gave and what he actually received. McCormick on Damages § 121 (1935); Annot., 13 A.L.R.3d 875, 881–82 (1967).

While Nevada has never specifically adopted one or the other of those two rules, it does not appear we need to in this case because the result would be approximately the same, whichever method was followed.

Next, appellants contend we should not approve the lower court's award of exemplary damages because of the provisions of NRS 42.010.[1] Appellants misconceive the theory of the lower court's award. It was in tort, not contract. NRS 42.010 is applicable and does authorize the award. We are not shocked by the amount of the award because it need have no relationship to the amount of compensatory damages. Alper v. Western Motels, Inc., 84 Nev. 472, 443 P.2d 557 (1968). There

---

[1]NRS 42.010. "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

appears sufficient evidence and reason to justify the fact of and amount of the award.

3. There was no error on the part of the trial court in finding Randono liable on an oral promise to repurchase promissory notes assigned to the Turks and secured by second trust deeds. Nor was that liability discharged by the trustee's sale.

The case of Swenson v. Stoltz, 78 P. 999 (Wash. 1904), is directly in point and controls this issue. In Swenson, the plaintiff purchased, for value, a note payable to defendant's order. Defendant did not endorse the note, but it was found he made an oral guarantee "that the note was perfectly good—as good as gold—and would be paid by said makers when it became due . . . ." *Id.* at 999. The rule announced in Swenson, which we adopt, is as follows: "The guaranty of a note is not a promise to answer for the debt of the maker, and is not within the statute of frauds, when it is negotiated in consideration of value received by the guarantor, but it becomes the original and absolute obligation of the guarantor himself, whereby he promises to pay his own debt to the guarantee; that is to say, the debt he owes his guarantee for what he has received from the latter. The note meanwhile is delivered and held as collateral to the promise of the guarantor. If the maker pays it at the date of its maturity, the guarantor's obligation is by that fact discharged; but, if the maker fails to pay, the guarantor remains liable upon his own obligation, which is absolute and independent of the note itself." *Id.* at 1000. There was substantial, albeit conflicting, evidence in the record that Randono said to Turks, "the notes were good as gold and . . . if at any time they go bad, I will buy them back from you."

Moreover, by proceeding to trustee's sale on the security, the Turks realized no gain but merely preserved Randono's rights under the notes to proceed against the makers or their assigns. Had they not done so, those rights would have been destroyed by the sale under the first deeds of trust. We see no error.

4. The lower court committed no error by its unnecessary order amending the judgment to make the community property of appellant and his wife liable for the judgment, even though she was not a party to the suit in the lower court. We conclude the entire community property of the Randonos was subject to liability of the judgments, irrespective of whether the wife was a party to the suit.

NRS 123.220[2] has been construed to provide that property acquired after marriage, "through the toil or talent or other productive faculty of either spouse" is community property. Fredrickson & Watson Const. Co. v. Boyd, 60 Nev. 117, 121, 102 P.2d 627 (1940). NRS 123.230 provides that the husband is to have "the entire management and control of the community property, with the like absolute power of disposition thereof, except as provided in this chapter, as of his own separate estate." The exceptions are found in NRS 123.040, which directs that a wife's earnings are not liable for the husband's debts; and NRS 123.210, which exempts the wife's separate property from liability for the husband's debts.

On the other hand, NRS 123.260, covering disposition of the community property on the death of the marital partners, provides: "Community property passing from the control of the husband, either by reason of his death or by virtue of testamentary disposition by the wife, is subject to his debts. . . ."

If community property can be given away by the husband (Nixon v. Brown, 46 Nev. 439, 214 P. 524 (1923)) and is subject to his debts upon his death (NRS 123.260), we see no reason why it is not subject to his debts, whether arising out of tort or contract, during his lifetime. This court has previously held in Jones v. Edwards, 49 Nev. 299, 307–08, 245 P. 292 (1926), that the wife need not be made a party when the husband is defending an action against the community property, since in legal effect she is a party to every action involving the community property. See also Carlson v. McCall, 70 Nev. 437, 271 P.2d 1002 (1954).

5. The trial court committed no error in denying appellants' motion to retax costs, since it was not timely filed. Randono contends he was not required to file his motion to retax costs until the judgment became final, and the judgment of March 27, 1968, did not become final until January 2, 1969, when notice was given by amendment to the judgment, *nunc pro tunc*. Respondents contend the motion to retax costs had to be filed within three days of the filing of their cost bill on March 27, 1968.

NRS 18.110 requires the memorandum of costs to be filed

---

[2]"All property, other than that stated in NRS 123.130, acquired after marriage by either husband or wife, or both, except as provided in NRS 123.180 and 123.190, is community property."

"within 5 days after the verdict or notice of the entry of judgment of the court. . . ." The Motion to Retax must be filed "[w]ithin 3 days after service of a copy of the memorandum. . . ." *Id*. It must be noted nothing is said in that statute about the judgment having to be "final" before the cost bill and motion to retax costs must be filed. Costs in this suit were mandatory because it involved causes of action for damages and title to real estate, both covered by NRS 18.020. Thus, the rule in Nelson v. Paul, 68 Nev. 365, 233 P.2d 857 (1951), governs, and not that of Magee v. Whitacre, 60 Nev. 202, 96 P.2d 201 (1939), an equity action in which the awarding of costs was discretionary. While determination of costs may be a factor in determining the finality of a judgment, the judgment need not be final before a motion to retax costs need be filed.

6. The lower court did not err in awarding Randono judgment on his counterclaim upon a note in which he was payee and the Turks were makers. Respondents claim error because of illegality. That affirmative defense was not pleaded as required by NRCP 8(c). We will not consider it for the first time on appeal.

Accordingly, judgment of the lower court is affirmed in all respects, except that in the judgment resulting from the collection agency transaction in favor of respondents and against appellants in the amount of $13,750, that sum should be reduced by $252, payments found to be made by the trial court but inadvertently not deducted.

ZENOFF, BATJER, MOWBRAY, and THOMPSON, JJ., concur.